BURROUGHS, Respondent, vs. CITY OF MILWAUKEE, Appellant.

*April 30 — May 21, 1901.*

*Municipal corporations: Injuries to travelers: Negligence: Defective streets.*

In an action for injuries received by stepping into a depression in the street on alighting from a street car at a crossing, it was established by the undisputed evidence that the depression was not more than an inch and a half deep at any point. *Held,* not an actionable defect in the street, notwithstanding it was at a point where a multitude of people were constantly getting on and off the cars.

APPEAL from a judgment of the superior court of Milwaukee county: ORREN T. WILLIAMS, Judge. *Reversed.*

For the appellant there was a brief signed by *Carl Runge,* attorney, and *Joseph B. Doe,* assistant city attorney, and oral argument by *Mr. Doe.*

For the respondent there was a brief by *Quarles, Spence & Quarles,* and oral argument by *W. C. Quarles.*

CASSODAY, C. J.   This is an action to recover damages for personal injuries sustained by the plaintiff upon stepping from a street car on which she was riding westerly on Grand avenue after the car had stopped immediately west of the intersection of the west line of West Water street and Grand avenue, by reason of an alleged defect in the asphalt pavement.   Issue being joined and trial had, the jury returned a special verdict to the effect: (1) That the plaintiff was injured July 13, 1898, by falling near the northwest corner of the intersection of Grand avenue and West Water street, in the city of *Milwaukee;* (2) that there was at the time when and the place where the plaintiff was injured such a defect in the asphalt pavement as rendered it unsafe or dangerous for persons alighting from street cars when in

the exercise of ordinary care; (3) that the condition of the pavement was, at the time and place of the accident, such that the defendant city, acting through its officers and agents having charge of its streets, in the exercise of ordinary care and prudence, ought to have known that such an accident as happened to the plaintiff might probably occur to persons using such street when in the exercise of ordinary care; (4) that such defective and unsafe condition of the pavement at the time and place of the plaintiff's injury was the proximate cause thereof; (5) that the plaintiff was not, at the time and place of the injury, guilty of a want of ordinary care which contributed to her injury; (6) that the plaintiff's left leg and ankle had not been previously weakened or injured so that it directly contributed to her injury on the occasion in question; (7) that they assessed the plaintiff's damages at $3,000.

Thereupon, and in pursuance of an order of the court, judgment was entered in favor of the plaintiff for the amount mentioned, with costs. From that judgment the defendant brings this appeal.

It is conceded that when the car stopped at the time and place mentioned the plaintiff, who was forty-three years of age and a widow, left her seat, which was crosswise the open car and about the middle thereof, and took hold of the post in front of her on the north side of the car with her left hand, and stepped down upon the step eight inches wide, which extended the whole length of the car, and then, after looking both ways to see if any teams were coming, she stepped down into a depression in the pavement, and her foot bent under her, and she fell, and seriously and permanently injured her. There were two street-railway tracks on Grand avenue, and the car in question was on the north track. It stopped at the usual and customary place for the stopping of all cars proceeding in a westerly direction. The intersection of those two streets was one of the princi-

pal business centers of the city, and was in constant use by large numbers of people traveling on foot and in vehicles. The principal question presented is whether it was error to refuse a nonsuit or to direct a verdict in favor of the defendant; in other words, Was the alleged defect in the pavement such as to authorize a recovery in this action? The answer to the question necessarily depends upon the evidence. Seven witnesses were sworn and examined on behalf of the plaintiff in respect to the dimensions of the hole or depression complained of. The first one testified to the effect that at the time of the accident the hole was from a foot and a half to two feet north of the north rail; that the granite blocks had sunk from a half to an inch below the adjacent pavement; that the hole was scooped out to the south part of the granite blocks towards the rail, between the granite blocks and the north rail of the track, from four to six inches in width, and a foot and a half in length, and an inch to an inch and a half deep; that next to the granite blocks it was straight down, and from the asphalt it was sloping in, and the greater depression was on the north side of the hole. Five of the plaintiff's other witnesses gave similar descriptions, varying in the length given from ten to thirty inches, and the width from six to ten inches, and the depth from one inch to two and one-half inches; all of them giving as the greatest depth one and one-half inches, except two, and they give as the greatest depth two and one-half inches. None of these witnesses made any measurement, but merely estimated the length, breadth, and depth as they remembered them. The testimony of the other witnesses on the part of the plaintiff will be considered later.

It appears from the testimony of a witness on the part of the defendant, and is undisputed, that he repaired the water pipe in front of Bloedel's jewelry store on Grand avenue May 28, 1898; that he cut out the asphalt in a square; that

he filled up the hole, tamped it solid, and put in about seven or eight granite blocks — some being eight inches long, some being a foot, and some a little longer — so as to break joints; that they were six, seven, or eight inches thick, and made to fit in unequal surfaces; that he cut a space about eighteen or twenty inches one way and about the same the other way; that he filled it up as good as he could with gravel and cinders, and tamped it down until it was solid, and pounded down the granite blocks to get them even with the asphalt. A policeman of the city, stationed near where the accident occurred, saw the plaintiff just after the accident, and testified to the effect that he measured the hole or depression on the same day; that he took a straight edge, and laid it across the hole, and by measuring with the straight edge lying northeast and southwest it measured an inch and a quarter at the deepest part, but that with the straight edge lying east and west it measured an inch and a half at the deepest place; that the hole was sort of oval shape; that the asphalt pavement is not exactly level at that place; that, holding the straight edge across one way, the end of it might be a little higher or a little lower than holding it another way, and, so to get the deepest depth, he measured it in different ways; that the depression was eighteen inches east and west (lengthwise), and thirteen inches across (north and south); that the south edge of the depression was two feet and five inches from the north rail of the street-car track. Another of the defendant's witnesses testified that he measured it with a rule he carried in his pocket; that it was eighteen inches long from east to west; that the width from the cobble stones to the asphalt, undisturbed, was thirteen inches; that the deepest part near the granite blocks was an inch and a half; that there was no perpendicular fall at the south edge; that it was " topped " off by the teams about half an inch; that the bottom of the depression sloped from the south to the north, so that the deepest point was an

inch and a half from the level pavement; that the slope began half an inch below the level of the pavement; that he got the measure down, and drew a line; and that he thinks he made such measurement July 28, 1898. Another of the defendant's witnesses testified to the effect that the accident happened nearly in front of his store; that there was a depression in the asphalt pavement at that place at the time; that he should judge it was about eighteen inches long and twelve inches wide, and from an inch to an inch and a half deep, but that he did not pretend to swear exactly to that depth.

Thus it appears that seven witnesses substantially agree as to the depth of the depression, two of them fixing it by actual measurement, and five of them by estimate; four of them being witnesses of the plaintiff. Two other witnesses of the plaintiff substantially agree with such measurement, except that in their estimates they put it about an inch deeper than such measurement. But the witness Meyers, in behalf of the plaintiff, who testified to the effect that he did business at the time of the accident on Grand avenue, three stores west of West Water street; that he heard of the accident three or four days after it occurred; that he did not examine the place of the accident any more than stopping there, waiting for a street car on his way home; that he noticed it, ever since the street was torn up, several times a day; that he noticed that rut up to the time it was filled in and repaired, the spring before the accident, in the same place, as a part of a prior excavation; that the rut was about four or five feet long, and about three feet wide, and probably three or four inches sloped down, worn off from vehicles passing over it, a little more in one place than in another; the deepest part was probably five or six inches; that he made no measurements of that depression; that on the day of the accident the rut was six or seven feet north of the north railroad track. The rut thus mentioned is obviously not the one the plaintiff stepped into, for she testi-

fied that with the left hand upon the post of the car she stepped down·upon the step of the car, and from there she stepped down upon the pavement, her foot coming into a hole, and she fell. As indicated above, the plaintiff's first witness on the subject testified that the hole into which she stepped "was from a foot and a half to two feet north of the north rail;" and that corresponds with the measurement made. The charitable view of the testimony of the witness Meyers is that in testifying as he did, nearly two years after the accident, he had reference to the rut as he remembered it at the time the repairs were made in the spring before the accident. Certainly, no substantial reliance can be placed upon his estimate as to the depth of the depression, as against the actual. measurement of two witnesses, corroborated by the estimates of seven others. We must hold that it is established by undisputed evidence that the depression was not more than an inch and a half deep at any place. That being so, must we not hold, as a matter of law, that there was no actionable defect in the street? The only serious doubt we have had upon that question is as to whether the city should not be held to a stricter responsibility by reason of the multitude of people constantly getting on and off the cars at that point. But, after careful consideration, we are constrained to hold that there is no credible evidence of any actionable defect in the street at the time and place in question. The facts bring the case squarely within the ruling of this court in a recent case. *Kleiner v. Madison*, 104 Wis. 339. In that case the ends of the boards constituting the apron were sawed off square, and elevated just a trifle less than two inches, and it was held not to constitute an actionable defect in the sidewalk. We are not aware of any well-considered case in this court requiring the case at bar to be submitted to a jury.

*By the Court.*— The judgment of the superior court of Milwaukee county is reversed, and the cause is remanded for a new trial.